IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ARRIE PROSSER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | No. 5:14-cv-21 (CAR) |
| THIELE KAOLIN COMPANY, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Arrie Prosser filed this action claiming Defendant Thiele Kaolin paid her unequal wages and retaliated against her by suspending and terminating her in violation of the EPA and the Fair Labor Standards Act of 1928, as amended, 29 U.S.C. § 201 *et seq*. Presently before the Court are the Parties' cross motions for summary judgment. For the reasons stated below, the Court **DENIES** both Motions for Summary Judgment [Doc. 22 & Doc. 24].

## STANDARD OF REVIEW

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[1] Not all factual disputes render summary judgment inappropriate; only a

_____

[1] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

genuine issue of material fact will defeat a properly supported motion for summary judgment.[2] This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4] The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5] If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[6] This evidence must consist of more than mere conclusory allegations or legal

---

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).
[3] *See id.* at 249-52.
[4] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[5] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26.

conclusions.[7]

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.[8] "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."[9] The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.[10]

## BACKGROUND

Defendant is in the business of mining and processing Kaolin ore, a material found in clay and utilized in various manufacturing processes.  It sells its product both domestically and internationally.  Approximately 300 people are employed in "operations" in its Sandersville, Georgia plant, and 5% are female.

Plaintiff worked 22 years for Defendant, from March 26, 1991, until her termination on April 12, 2013. Throughout her employment, Plaintiff worked at various positions. She started off as a bagger, an entry-level position, and was promoted six

---

[7] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[8] *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

[9] *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted).

[10] *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

times between 1993 and 2001, until she reached the position of "Centrifuge Operator," the position she held for the next twelve years.

All Centrifuge Operators perform the same duties, which is to take clay from the tanks and run it through designated processes. There are no requirements to become a Centrifuge Operator outside of the minimum requirements for an entry level position, and Plaintiff met all the qualifications required to be a Centrifuge Operator. A Centrifuge Operator is within the highest level of pay in operations. As a Centrifuge Operator, Plaintiff was in the highest position outside of management.[11] At the time of her termination, Plaintiff was the senior Centrifuge Operator. Three males also held the position of Centrifuge Operator at the time of Plaintiff's termination: James "Buddy" Caneega, Kenny Smith, and David Brantley.

**Defendant's Pay Raise Structure and Plaintiff's Pay Raises**

Defendant provides three ways for an employee to receive a pay raise: a general increase, a merit- based increase, and a promotional increase.

General increases are awarded to employees each year. Although general increases have been denied to employees due to poor performance, Plaintiff was never denied a general increase while employed with Defendant.

---

[11] Defendant asserts that a Centrifuge Operator is the highest position without any managerial duties; the highest position, relief foreman/flock and leach operator, is responsible for "some managerial duties." Rule 30 (b)(6) Dep., Doc. 26-2 at 16.

Merit-based increases, Defendant contends, are based on performance, but are also given for pay grade reasons. The current merit-based system began in 2005, although employees received merit increases previous to 2005. Merit increases are awarded based on an employee's performance, and "top performers" are rewarded for their "exceptional performance."[12] Defendant gives managers discretion to determine which employees deserve a merit increase. In assessing who receives a merit increase, managers can request a compensation report from Human Resources for the employees they supervise.[13] George Lord, Plaintiff's manager at the time of her employment, said he considered performance a "threshold matter", but he also looked at an employee's pay in relation to his or her current pay grade, as well how an employee's pay compared to other employees.[14] Alex Cawthon, executive Vice President of Human Resources, noted that there is "no consistent policy," but the "message...was [merit increases] should be used wisely and should be given to employees whose performance merited a merit increase."[15]

---

[12] Rule 30(b)(6) Dep. Doc. 26-2 at 23; Cawthon Dep., Doc. 26-4 at 27. Plaintiff disputes the criteria for a merit increase.

[13] Defendant has never performed a compensation audit of its employees, but Defendant's EEO Policy is disseminated to all employees and applies to discriminatory pay practices.

[14] Lord Decl. Doc. 23-12 at 3.

[15] Cawthon Dep., Doc. 26-4 at 42-43. Cawthon also specified that merit increases were for "exceptional" employees or employees that "hit one out of the park." *Id.* at 29, 39.

A Centrifuge Operator's minimum hourly pay grade in 2012 was $23.74, the midpoint was $27.00, and the maximum was $30.26.[16] At the time of her termination, Plaintiff received $23.98 an hour, and the male Centrifuge Operators received almost $2 more: Brantley $25.82; Caneega $25.65; and Smith $25.65. Ronnie Adams, Plaintiff's Shift Supervisor, and George Lord, the Plant Manager, were aware of a discrepancy in pay between Plaintiff and her male counterparts in early Fall of 2012. Defendant claims that Lord spoke to Daryl Hutchings, the Plant Operations Manager, about Plaintiff's pay discrepancy, but they agreed her "performance did not warrant a merit increase at that time"; Plaintiff disputes this.[17]

Plaintiff received her last merit increase in 2002, for pay grade reasons.  Plaintiff's male counterparts, Brantley, Caneega, and Smith, received two merit increases for pay grade reasons—one in February and another in November of 2002. Brantley received a third merit increase in 2011 because he was "very dependable."[18]  Smith received a three additional merit increases, for a total of five—one in 2004 because he was a "great operator"; another in 2005 because he was "very versatile," and "willing to do anything

---

[16] Lord Decl., Doc. 23-12 at 2.

[17] Lord Decl., Doc. 23-12 at 4; Pl. Dep., Doc. 26-1 at 101-06.

[18] Lord Decl., Doc. 23-12 at 4. Plaintiff objected to this information because she claimed that it was not previously produced in discovery. The Court reopened discovery on this issue. Plaintiff and Defendant presented additional evidence to the Court and fully briefed this new evidence. Accordingly, the Court has considered the entire record before it.

asked"; and again, in 2011 because he was "very versatile" and "volunteered to fill other roles."[19] Subsequent to 2002, Plaintiff never received a merit increase.

Promotional increases are, according to Defendant, given to an employee based on their performance. Like merit increases, Defendant awards promotional increases to employees at the discretion of management, and, although typically approved, they are not always approved.[20]   An employee can be promoted to a higher position due to a vacancy created when another employee retires or leaves, or due to a "shift realignment"—when there is a shift change, such as adding another shift. Defendant does not always award a promotional increase when an employee is promoted, and it does not award promotional increases for a promotion due to a shift realignment. Defendant's current promotional-increase structure began in 2003, but like merit increases, Defendant awarded promotional increases to employees previous to 2003.

Plaintiff was promoted six times during her employment with Defendant, with her final promotion being in 2001 when Plaintiff became a Centrifuge Operator due to a "shift realignment." Because Plaintiff was directly promoted to Centrifuge Operator, Plaintiff "skipped" over the three positions typically held prior to becoming a Centrifuge Operator—Assistant Filter Operator, Filter Operator, and Senior Filter Operator.[21] Thus, she did not receive promotional increases traditionally given by

---

[19] Lord Decl., Doc. 23-12 at 4-5.
[20] Rule 30(b)(6) Dep., Doc. 26-2 at 21; Lord Decl., Doc. 23-12 at 3.
[21] Def. Rep. Br., Doc. 36 at 6.

Defendant when promoted to those positions. However, even though Plaintiff was promoted five times previous to becoming a Centrifuge Operator, Plaintiff never received a promotional increase.[22]

Unlike Plaintiff, Plaintiff's male counterparts received promotional increases when promoted to higher positions. Brantley received promotional increases in 1997, 1998, 2001, and 2010.[23] Caneega received promotional increases in 2001, 2004, and 2012.[24] Smith received promotional increases in 1999, 2000, 2007, and 2013.[25]

**Plaintiff's Performance History**

Defendant only conducts performance reviews during an employee's probationary period at three and six months after the initial hire.  Defendant does not have a culture of documenting performance. [26] When an employee exhibits performance issues that "reach the level that needs to be documented," Defendant has a "counseling" procedure/form it utilizes for documenting these issues.[27] The form is filled out by an employee's supervisor documenting the performance issue, and it includes what is expected of the employee in the future. The employee and his or her

---

[22] Pl. Ex., Doc. 30-2 at 1-5.
[23] Doc. 29-3 at 1-2.
[24] Doc. 29-5 at 1.
[25] Doc. 29-6 at 1.
[26] Lord Dep. Doc. 26-7 at 23.
[27] Rule 30 (b)(6) Dep., Doc. 26-2 at 30.

8

supervisor then signs the form.[28] However, Defendant does not have a "magic number" for when the counseling procedure is used.[29]

In Plaintiff's six-month performance review, Plaintiff was given good to average marks in her reviews and found to be promotable. The only negative comments documented surrounding Plaintiff's performance during her employment with Defendant were in 1996 and 1997. In granting Plaintiff a merit increase in 1996, her supervisor noted that "[w]e have had problems with [Plaintiff] in the past concerning her attitude, [and] her ability to get along with others…. We have talked with [Plaintiff] about these problems[,] and she is trying to be a better employee."[30] In 1997, Plaintiff received a counseling due to her failure to wash the filters; however, Plaintiff claims she did not deserve the counseling because she told her supervisor that the reason for her failure to perform this duty was due to illness.[31] Plaintiff claims she was never allowed to read it and was forced to sign the counseling form under protest. In 1999, Defendant noted that she was "making an effort to show that she could do the job" and that her "attitude ha[d] improved."[32]

Defendant asserts that Lord had problems with Plaintiff's attitude and performance from the time he became Plant Manager in 2004 until her termination.

---

[28] *Id.*
[29] Rule 30 (b)(6) Dep., Doc. 26-2 at 29-30.
[30] Pl. Dep. Ex. 5, Doc. 23-13 at 2.
[31] Pl. Dep., Doc. 26-1 at 101-06.
[32] Doc. 29-14 at 1.

Defendant claims that in 2008 Plaintiff's performance issues were brought to the attention of both Hutchings and Lord.  However, according to Defendant, these issues were not documented because they seemed connected exclusively with another employee, and Defendant was hoping that the issues would work themselves out when that other employee retired.[33] Defendant contends it continued to have issues with Plaintiff's performance—she was slow and had a "rude attitude."[34] Plaintiff disputes these facts. Defendant did not document these issues.

Ronnie Adams became Plaintiff's Shift Supervisor in 2012 and testified he had a disciplinary problem with Plaintiff shortly thereafter. In that incident, Relief Foreman Brian Lovett claimed that he asked Plaintiff to perform a task, but she ignored him. Plaintiff denies this incident. Hutchings and Lord assert they met with Plaintiff to verbally counsel her regarding her job performance and attitude in early 2012. At the meeting, Defendant contends various issues were addressed with Plaintiff, such as her rude manner on the phone, the incident with Lovett, and her failure to carry out instructions and perform tasks in a timely manner.[35] Plaintiff denies that this meeting ever occurred. Neither the meeting nor the issues were documented.

---

[33] Hutchings Dep., Doc. 26-5 at 9-10. Plaintiff contends that because this was not documented, it is an "after-the-fact rationale" for paying Plaintiff less. Doc. 29-1 at 7.

[34] Hutchings Dep., Doc. 26-5 at 10. Plaintiff claims she performed her job well, and she was not slow. However, she sometimes needed assistance to reach a valve that she could only open or close by climbing on pipes, and the shutdown process took 30-60 minutes depending on the grade of clay—she had no control over that process. Doc. 29-1 at 8-9.

[35] Hutchings Dep., Doc. 26-5 at 16; Lord Dep., Doc. 26-7 at 12.

**Plaintiff's Complaint, Suspension, and Termination**

In January of 2013, Plaintiff asked Adams about the possibility of a raise. Adams then spoke to Lord, who told Adams that Plaintiff had not received a raise since 2002, due to her poor attitude and performance. Adams contends he spoke with Plaintiff regarding ways she could improve her performance. Plaintiff, however, claims he never spoke to her about ways to improve. Adams asked her again in February and March whether she had received a raise.

On Thursday afternoon, April 4, 2013, Plaintiff utilized Defendant's "open door policy," went into the office of Alex Cawthon, Executive Vice President of Human Resources, and asked him why she had not received a raise in ten years. She told Cawthon that her "pay is lower than the guys' is."[36] Cawthon called HR and learned that Plaintiff's last merit raise was in 2002. He told Plaintiff he would look into the issue further. After the meeting, he emailed Hutchings who replied that she was not "the best operator in the world" and "no one wants to work with her."[37] Cawthon told Hutchings that if her performance issues were not documented, then Defendant was "not in a good position with her pay…."[38] Recognizing a potential problem, Cawthon investigated Plaintiff's complaint by speaking with Gloria Lindsey, the HR Benefits Manager, as well as Hutchings and Adams.

---

[36] Pl. Dep., Doc. 26-1 at 45; Cawthon Dep., Doc. 26-4 at 105-106.
[37] Cawthon Dep. Ex. 2, Doc. 23-18 at 2.
[38] *Id*.

The next morning, on Friday April 5, 2013, Hutchings called Plaintiff and told her to report to Cawthon's office at 8:30 a.m. According to Cawthon, they sat down with Plaintiff "to get this thing on track."[39] Plaintiff states that when they went back to the office Cawthon asked Hutchings "what you got on [Plaintiff]?"[40] Hutchings responded that she "ran over a tank" and that he talked to five people who said they did not like working with her.[41] Plaintiff asserted that she did not run over a tank. During the meeting Cawthon claims that Plaintiff became very agitated, argumentative, and disruptive, arguing over the incident with the tank. Cawthon believed Plaintiff to be mocking Hutchings, and it was his impression that she laughed at the two men.[42] She continued "to act that way" and he asked her leave his office.[43]

Plaintiff denies that she acted argumentatively and tells a different version of the meeting. Plaintiff claims that after she explained why the tank running over was not her fault, Cawthon asked her how much money she made and whether she thought she could get paid that much anywhere else. She said she did not know, to which he responded that she could not make as much elsewhere. She remained silent. Cawthon repeated his question, asking her if she could get paid as much somewhere else. When she still remained silent, Cawthon asked Plaintiff why she was looking at him. Cawthon

---

[39] Cawthon Dep., Doc. 26-4 at 59.
[40] Pl. Dep., Doc. 261 at 58.
[41] *Id*. at 59.
[42] Cawthon Dep., Doc. 26-4 at 85-86.
[43] *Id.* at 62.

told her "oh, I can tell from the expression on your face, oh, yeah, you got an attitude."[44] He then asked Hutchings if he had someone who could do her job. When Plaintiff still sat silent, Cawthon instructed Plaintiff to go home. Plaintiff did as she was directed to and left for the day.[45]

Shortly after the meeting, Cawthon said he wrote and mailed Plaintiff a letter that she was suspended from work because of her unacceptable attitude during the meeting. He wrote, "[w]hen you are ready to behave with a more cooperative spirit and show a sincere desire to work through these problems, please let me know. You will not be allowed to return until you provide [Defendant] with a <u>written commitment</u> assuring us that your performance and attitude will meet our expectations moving forward."[46]

The next day, on Saturday, April 6, 2013, when Plaintiff reported to work, she was informed that she was suspended, that she would receive a letter, and that she should contact Cawthon on Monday, April 8th.

On Monday morning at 9:00 a.m., Plaintiff contacted Cawthon and told her she would receive a letter explaining what she needed to do to return to work; she received Cawthon's first letter that day. Cawthon claims he also tried to call Plaintiff later on Monday, but she never returned his call. Plaintiff denies receiving this call.

---

[44] Pl. Dep., Doc. 26-1 at 60.
[45] Pl. Dep., Doc. 26-1 at 61.
[46] Cawthon Dep. Ex. 4, Doc. 23-20 at 2 (emphasis in original).

On Tuesday, April 9th, Plaintiff felt she "needed to react" and responded to Defendant's letter "as soon as possible" to "save [her] job,"[47] stating:

> In Jan. of this year I spoke to Ronnie Adams, who is my foreman, about receiving a raise. He told me he would inquire for me[.] Three months later I had not received or heard about receiving a raise. Then taking advantage of the Companies' [sic] Open Door Policy, I came to see you about receiving a raise.
>
> In the meeting I was trying to make sure to hear all that you had to say. I meant no disrespect by the expression on my face. I may have been a bit nervous. If I did anything wrong, I do apologize.[48]

That same day, knowing Plaintiff had not received the first letter, Cawthon mailed a second letter stating:

> We have not heard from you. Certainly it is our desire to work through this matter so it can be a 'win-win' for you and Thiele . . . I want to restate what you must do. You must submit written assurance, satisfactory to Thiele, by the close of business Friday, April 12th, that your performance and attitude will improve immediately. If you are unresponsive, your employment will be terminated.[49]

The next day, on Wednesday April 10th, both Plaintiff and Cawthon received each other's letters. On Plaintiff's end, having just sent her response to his first letter the day before, she did not send another response. On Cawthon's end, he received Plaintiff's response to his first letter. Although he recognized that she apologized for her behavior, he deemed it unacceptable because it was not what he expected or wanted from her.

---

[47] Pl. Dep., Doc. 26-1 at 75.
[48] Pl. Dep. Ex. 2, Doc. 23-14 at 2.
[49] *Id*. at 3.

On Thursday, April 11th, Cawthon emailed Hutchings and copies HR and his superior, stating he had given Plaintiff "six chances" to comply with his letter demand, and he found her response to be "unresponsive."[50]

On Friday, April 12th, Plaintiff was terminated. Plaintiff did not respond to Defendant's second letter. Defendant never informed Plaintiff that her first letter was unacceptable. Plaintiff received confirmation of her termination on April 16, 2013. Plaintiff filed her Charge of Discrimination with the EEOC on June 28, 2013, and filed this case on January 13, 2014.

## DISCUSSION

Plaintiff brings claims for unequal pay and retaliation under the Equal Pay Act. The Court addresses both claims in turn, and, as explained below, the Court finds there are genuine issues of material fact as to both claims.

## I.    Unequal Pay

The Equal Pay Act (EPA) prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work.[51] A female employee demonstrates a *prima facie* case of an EPA violation by showing that her employer paid male employees different wages for equal work for jobs which require "'equal skill, effort, and responsibility, and which are performed under similar working

---

[50] Cawthon Dep. Doc. 26-4 at 105; Doc. 26-15 at 2.
[51] 29 U.S.C. § 206(d)(1).

conditions.'"[52] Once the employee presents a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) ... any other factor other than sex."[53] Defendant concedes that Plaintiff has met her prima facie case on her EPA claim and asserts exclusively the "factors other than sex" defense.

The factors other than sex defense is a broad "catch-all" exception that encompasses an almost limitless number of gender-neutral factors. [54] The defense is meant to prevent courts from substituting their judgment for the employer's judgment.[55] The burden to prove this defense is a <u>heavy</u> one, and the employer must demonstrate that "the factor of sex provided <u>no basis</u> for the wage differential."[56]  If the employer "fails to convince the trier of fact, then the plaintiff wins."[57] Moreover, "[t]he plaintiff is not required to prove discriminatory intent on the part of the defendant,"[58] and the defendant is held strictly liable.[59]

---

[52] *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir.1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) and 29 U.S.C. § 206(d)(1)).
[53] 29 U.S.C. § 206(d)(1).
[54] *Corning Glass Works*, 417 U.S. at 197.
[55] *County of Washington v. Gunther*, 452 U.S. 161, 171 (1981).
[56] *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (emphasis in original).
[57] *Meeks v. Computer Associates International*, 15 F.3d 1013, 1018 (11th Cir. 1994).
[58] *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) (citing *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539 (11th Cir.1991)).
[59] *Miranda*, 975 F.2d at 1533.

On the other hand, if the employer "establishes that the disparity in wages are justified by one of these exceptions, then the plaintiff must come forward with affirmative evidence that indicates that the proffered reason for the disparity is actually a pretext for sex discrimination."[60] In other words, if the defendant proves an affirmative defense, "the plaintiff's claim can survive a motion for summary judgment only if the plaintiff shows with affirmative evidence that the reason offered for the pay disparity was pretextual or was offered as a post-event justification."[61]  If the plaintiff can "create the inference of pretext, there is an issue which should be reserved for trial."[62]

---

[60] *Schwartz v. Florida Board of Regents*, 954 F.2d 620, 623 (11th Cir. 1991).

[61] *Edwards v. Fulton Cnty., Ga.* 509 Fed. App'x. 882, 885 (11th Cir. 2013).

[62] *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). The court notes that the Eleventh Circuit has suggested that the burden does not necessarily shift back to the plaintiff. In *Mulhall*, the court, in dicta, noted that "[i]f [an affirmative defense is] proven, defendant is absolved of liability as a matter of law." 19 F.3d at 590-91 (11th Cir. 1994). However, in *Mulhall*, none of the four groups of defendants met their burden of persuasion with regard to any affirmative defenses; therefore, the court never had to address the issue of pretext. *Id.* at 591-97. After *Mulhall*, many courts have not stopped the inquiry at the defendant's establishment of an affirmative defense, but have continued to look at whether the plaintiff could show pretext by showing a genuine issue of material fact as to defendant's affirmative defense. *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003) (finding there was no evidence to rebut defendant's proffered defense); *Irby*, 44 F. 3d at 956 (plaintiff attempted to refute defendant's defense as pretextual by claiming it was "too subjective"); *Seldon v. Total System Services, Inc.*, 653 F. Supp. 2d 1349, 1365-66 (M.D. Ga. 2009) (finding that the plaintiff failed to point the court to probative evidence that would establish pretext or post-event justification of the defendant's affirmative defense); *Duncan v. Madison County*, No. 3:05-CV-93 (CDL), 2007 WL 2874803, *5 (M.D. Ga. Sept. 27, 2007) (noting, even after the defendants successfully established their affirmative defense, that the plaintiff "has produced no evidence from which a reasonable jury could conclude that the pay disparity was based on Plaintiff's gender"). As such, the Court uses this analytical framework in this case.

To establish the factors other than sex defense, an employer may not rely on a "general practice" but may consider factors such as the "unique characteristics of the same job; ... an individual's experience, training or ability; or... special exigent circumstances connected with the business."[63] The Eleventh Circuit has strongly suggested that the factors other than sex must be business-related[64] and "sufficiently objective to…be rebutted…."[65]   At the very least, an employer must present "an explanation of how those factors actually resulted in an individual employee earning more than another."[66]

Defendant contends Plaintiff's pay was less than her male counterparts because her performance did not warrant merit or promotional increases. As discussed below, because there are genuine issues of fact as to whether Defendant's policies for giving merit increases and promotional increases are sufficiently objective to be factors other than sex, the Court cannot grant summary judgment for either party on this issue.

### A.  Merit Increases and Promotional Increases

The Court finds that there are genuine issues of material fact as to whether Defendant can prove its factors other than sex defense and whether Defendant's

---

[63] *Glenn v. General Motors Corp.,* 841 F.2d 1567, 1571 (11th Cir.1988).
[64] *See Price v. Lockheed Space Operations Co.,* 856 F.2d 1503, 1506 (11th Cir.1988) (remanding for jury determination of whether any additional and legitimate business reasons existed); *Glenn,* 841 F.2d at 1571 (noting that exigent circumstances should be "connected with the business").
[65] *Schwartz,* 954 F.2d at 624.
[66] *Brock v. Georgia S.W. Coll.,* 765 F.2d 1026, 1037 (11th Cir.1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988).

proffered reasons for denying Plaintiff merit and promotional increases were pretext for unequal pay.

According to Defendant, merit increases are awarded at the discretion of management to employees who are "top performers" and who have displayed "exceptional" performance over the prior year.[67]  Defendant asserts that employees become eligible for a promotion due to their performance, and promotions are granted at the discretion of management.[68] Defendant contends Plaintiff did not receive a merit increase or a promotional increase in the last decade of her employment because she displayed poor performance.

The Court recognizes that an employee's "performance" is a valid factor other than sex if it is "sufficiently objective" for a plaintiff to rebut it.[69] Here, genuine issues of material fact exist as to whether Defendant's merit increase policy is sufficiently objective to be a factor other than sex.  Defendant has given inconsistent testimony as to its merit-increase policy. Defendant's 30(b)(6) witness testified that merit increases are "based solely" on performance and given at the discretion of management.[70] However, it is unclear what objective criteria the management to used in exercising their

---

[67] Rule 30(b)(6) Dep., Doc. 26-2 at 23.

[68] Def. Reply to Pl. Sup. Br., Doc 40 at 2.

[69] *See Schwartz*, 954 F. 2d at 623-24. In *Schwartz*, the plaintiff argued that the factors were too subjective to be relied upon outside of a formal merit system; however, the court held that the justifications—including performance—were "sufficiently objective to allow them to be rebutted and thus [we]re properly considered" as other factors. *Id.*

[70] Rule 30(b)(6) Dep., Doc. 26-2 at 20.

discretion. Indeed, Cawthon testified Defendant had "no consistent policy," and the "message…was [merit increases] should be used wisely and should be given to employees whose performance merited a merit increase."[71]  In addition, George Lord, who was responsible for making recommendations for merit increases in the production department, said that exceptional performance was a "threshold consideration" for a merit increase.  However, Lord also looked at both an employee's pay in relation to the applicable pay grade for the position and to other employees' pay in the same position.[72]

Even more damaging is that the record also shows Defendant awarded merit increases for minimum pay grade reasons.[73] Indeed, Plaintiff received her final merit increase in 2002 to bring her into a minimum pay grade for a Centrifuge Operator—not for performance. Moreover, when Defendant awarded merit increases to employees for pay grade reasons, performance was <u>not</u> noted as a reason for the increase. [74] Although the Court recognizes that discretion based on objective criteria, like performance, could satisfy the objective standard, such criteria is not present in this case.  The Court finds

---

[71] Cawthon Dep., Doc. 26-4 at 42-43. Cawthon also specified that merit increases were for "exceptional" or employees that "hit one out of the park." *Id*. at 29, 39.

[72] Lord's Dec., Doc. 23-12 at 2.

[73] Plaintiff argues that some merit increases were actually based on seniority and given in an *ad hoc* way after a promotion to the male employees, and were not merit increases at all, but were promotional increases in disguise. Pl. Supp. Reply Brief. Doc. 39 at 3-4.

[74] *See* Hutchings Dec. Doc 23-16 at 6-15.

that the criteria management used in exercising its discretion was inconsistent and thus overly subjective.

The Court also finds genuine issues of material fact exist as to the subjectivity of Defendant's promotional increase policy. Defendant asserts that employees become eligible for a promotion due to their performance, and promotions are granted at the discretion of management.[75] It contends there are two types of promotions: when an employee retires or leaves, and when there is a "shift realignment." According to Defendant, when an employee is promoted due to a vacancy, they are eligible for a promotional increase, i.e., a raise, but, when an employee is promoted due to a "shift realignment," they are not eligible for a promotional increase.  Defendant also contends that it does not give promotional increases every time an employee is promoted, and Plaintiff did not receive promotional increases because of her poor performance.

Outside of contentions in its briefs, however, Defendant presents no evidence that promotions are based on performance. In fact, Defendant's 30(b)(6) witness testified that since 2003, promotions were given at the discretion of management but listed no criteria for their determination, nor could she speak to how promotional increases were determined previous to 2003.[76] Plaintiff disputes this and contends Defendant determines promotional increases on seniority, not performance. Plaintiff testified that if a position opened, the most senior operator would be promoted to that

---

[75] Def. Reply to Pl. Sup. Br., Doc 40 at 2.
[76] Rule 30(b)(6) Dep. Doc. 26-2 at 17, 22.

position.[77]   Indeed, the majority of Plaintiff's promotions, as reflected in Defendant's personnel documents, note that she was replacing an employee.[78] Plaintiff also points to several personnel documents supporting her contention.[79] This evidence is sufficient to raise a genuine issue of material fact as to whether promotional increases were in fact based on performance.

In addition, Plaintiff has raised an inference of pretext or post-event justification for her pay disparity. Defendant claims that Plaintiff's performance did not warrant merit or promotional increases, referencing problems in 2004, 2008, and verbally when it verbally addressed her performance and attitude issues in 2012 and in 2013. Plaintiff, however, denies these incidents.   Moreover, although Defendant denied general increases in the past for poor performance, it never denied Plaintiff a general increase. Additionally, although Defendant had a procedure for counseling employees with poor performance, it only counseled Plaintiff once in 1997. Finally, Defendant has presented no evidence outside of post-complaint documentation, and the 15-year old counseling form that Plaintiff had performance problems.[80]

---

[77] Prosser Dec., Doc. 29-20 at 1.

[78] Doc. 29-17 at 1-6.

[79] Doc. 39-2; Doc. 39-3; Doc. 39-4. One of these forms acknowledged that Caneega and Smith would maintain their seniority for job changes, such as promotions.

[80] Moreover, in 1999, a notation in Plaintiff's personnel form stated that she was "making an effort to show that she could do the job" and that her "attitude ha[d] improved." Doc. 29-14 at 1.

Defendant claims it does not generally have a culture of documenting performance issues, and the inquiry into pretext centers on the employer's beliefs. [81] However, courts have found that the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext,[82] and "even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment."[83]

Despite its contention that it regarded plaintiff as having continuous performance and attitude issues, it only documented one counseling in her entire twenty-two year employment with the company.  In fact, Cawthon recognized and admitted that the failure to document did not put Defendant in a good position.[84]

Defendant's contention that Plaintiff had performance issues is further belied by the fact that Plaintiff was promoted six times, five times due to a vacancy and one time due to a shift realignment. A reasonable juror could also infer Plaintiff's bad

---

[81] *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). Defendant contends that its depositions and affidavits attesting to Plaintiff's poor performance are sufficient to overcome Plaintiff's belief that she performed her job well. To support its argument, it points to *Seldon*; however, the Court finds *Seldon* distinguishable. 653 F. Supp. 2d. 1349. Unlike the present case, *Seldon* hinged on three criteria: experience, job knowledge, and performance, and the court found that the plaintiff's perception of her exceptional performance was insufficient to create a genuine issue of material fact where the defendant presented sworn affidavits as to the plaintiff's particular lack of job skills, performed evaluations throughout plaintiff's employment, and proffered evidence that the comparators had job related experience and knowledge superior to her own.
[82] *See Stanfield v. Answering Serv., Inc.*, 867 F.2d 1290, 1294 (11th Cir.1989).
[83] *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012).
[84] Cawthon Dep. Ex. 2, Doc. 23-18 at 2.

performance was pretext simply by the fact that she actually received promotions, but never received a promotional increase.

Although Defendant contends that it does not give promotional increases every time an employee is promoted, Plaintiff's male counterparts received various promotional increases: Brantley received four promotional increases, Caneega received three, and Smith received four.[85] Finally, Defendant's argument that Plaintiff failed to receive a promotional increase because, as a Centrifuge Operator, she was not eligible for promotion, is simply tautological.

Moreover, a jury could find unworthy of credence Defendant's argument that Plaintiff did not have the same opportunity for promotional increases as her male counterparts because she "skipped" to the higher position of Centrifuge Operator in the shift realignment, while her male counterparts ascended the ranks along the Defendant's customary promotional stages. However, while Plaintiff received a dramatic promotion in title—a promotion that her male counterparts would not receive for the next nine to ten years—in reality she received two dollars less than her male counterparts, and only 24 cents above the minimum pay grade.[86]

---

[85] Brantley received promotional increases in 1997, 1998, 2001, and 2010. Caneega received promotional increases in 2001, 2004, and 2012. Smith received promotional increases in 1999, 2000, 2007, and 2013.

[86] Moreover, Lord recognized the significant pay differential in 2012 between Plaintiff and her male counterparts and claimed that because of her performance, she was not eligible for a merit increase. Lord Dec., Doc 23-12 at 4.

Based on this evidence a reasonable jury could disbelieve Defendant's reasons for failing to award Plaintiff merit and promotional increases, and ultimately conclude these reasons were merely pretext or post-event justifications for Plaintiff's pay disparity. [87] Therefore, the Court **DENIES** both parties Motions for Summary Judgment as to Plaintiff's EPA claims.

II.   **Retaliation**

Plaintiff also contends that she was terminated in retaliation for complaining to Defendant about her unequal pay. Under the anti-retaliation provision of the Fair Labor Standards Act ("FLSA"), which encompasses retaliation for complaints under the EPA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed a complaint or instituted or caused to be instituted any proceeding under or related to this Act."[88] To establish a *prima facie* retaliation claim, the plaintiff must establish that "(1) [s]he engaged in statutorily protected expression, (2) [s]he suffered an adverse employment act, and (3) some causal connection existed between the two events," with causation requiring the plaintiff to show "(1) that the decisionmakers were aware of the protected conduct and (2) that the protected activity

---

[87] *Mulhall.*, 19 F.3d at 595 (denying summary judgment on Defendant's EPA affirmative defense, noting that "[c]redibility and the weight to be given such 'explanations' are traditionally matters left to the consideration of fact finders").
[88] 29 U.S.C. § 215(a)(3).

and the adverse act were not wholly unrelated."[89] Defendant contends Plaintiff is unable to make out her *prima facie* case as to the first and third elements.

### A. Protected Activity

Defendant does not dispute a complaint of equal pay is a protected activity; however, Defendant contends that Plaintiff never complained about unequal pay on the basis of her sex. The Court disagrees.

To prove Plaintiff engaged in a protected activity under the EPA she must "[a]t a minimum . . . generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."[90] The court "will not presume that a decisionmaker was motivated to retaliate by something unknown to him or her."[91] Therefore, the plaintiff's complaints to the employer "must clearly put [the] employer on notice of a violation of the law."[92]

 Plaintiff claims she engaged in a protected activity when she complained to Cawthon on April 4, 2013, that her "pay is lower than the guys' is."[93] Defendant claims Plaintiff "never told Cawthon" that she had not received a raise "because of her sex." However, according to Cawthon's own testimony, Plaintiff "may have" complained

---

[89] *Godby v. Marsh USA, Inc.*, 346 Fed. App'x. 491, 493 (quoting *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

[90] *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

[91] *Johnson v. State of Florida, Department of Elder Affairs*, 2010 WL 1328995, *2 (N.D. Fla. Mar. 30, 2010) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

[92] *Id.* (citing, inter alia, *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999)); *see also Birdyshaw v. Dillard's Inc.*, 308 Fed. App'x 431, 436-37 (11th Cir. 2009).

[93] Pl. Dep., Doc. 26-1 at 45.

about being paid less than males due to her sex, and although she may not have "put it

that succinctly," he believed "she did make the assertion or implication that she was

being paid less."[94] Therefore, even though Plaintiff did not use the words "equal pay

act" or "gender-based wage differential," the Court finds Plaintiff did make a

sufficiently clear and detailed complaint, which a reasonable employer, considering the

context and content, would have understood that Plaintiff was asserting her rights to

equal pay.[95]

### B. Causal Connection

To demonstrate a causal connection, a plaintiff must show the decision maker

was aware of her protected conduct, and the protected activity and adverse action were

not wholly unrelated.[96]   Additionally, "a plaintiff must also show that retaliatory

animus was the but for cause of the challenged adverse action."[97] Plaintiff can satisfy

---

[94] Cawthon Dep., Doc. 26-4 at 105-106.

[95] *Miller v. Roche Surety & Casualty Co., Inc.*, 502 Fed. App'x. 891, 894 (11th Cir. 2012) (noting that "the complaint must be sufficiently clear and detailed so that a reasonable employer, considering the context and content, can understand that an employee is asserting rights provided by the [statute] and calling for the protection of those rights"); *see also Weatherly v. Alabama State University*, 2011 WL 6140917, (M.D. Ala. 2011).

[96] *Davis v. Florida Agency for Health Care Admin.*, 2015 WL 2344108 (11th Cir. 2015) (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013)).

[97] *Booth v. Pasco Cnty.*, 757 F.3d 1198, 1207 (11th Cir. 2014). Plaintiff argues that "but for" causation should be applied in the pretext stage, and not in the *prima facie* stage, as Defendants argue. The Court recognizes that the Eleventh Circuit has yet to establish a clear precedent as to which stage that "but for" causation should be applied. *See Hawkins v. BBVA Compass Bancshares, Inc.*, No. 14-14480, 2015 WL 3462294, at *7 (11th Cir. June 2, 2015) (applying "but for" at the prima facie stage); *Mealing v. Georgia Dep't of Juvenile Justice*, 564 F. App'x 421, 427 (11th Cir. 2014) *cert. denied*, 135 S. Ct. 1165 (2015) (applying "but for" at the pretext stage); *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 833 (11th Cir. 2013) (noting that the *Nassar* Court did not

her burden if she can prove that the temporal proximity between the time her employer learned about her protected activity and her discharge is "very close."[98]

Defendant suspended Plaintiff on April 5, 2013, the day after she made her complaint to Cawthon, and terminated her on April 12, 2013, only a week later. Therefore, the suspension was immediate, and the termination was within the week. The Court finds this temporal proximity to be sufficiently "very close" to show a causal connection and satisfy Plaintiff's burden of proving but-for causation on summary judgment.[99] However, Defendant argues that Plaintiff's attitude at the April 5 meeting and failure to provide Defendant with a satisfactory letter subsequent to that meeting were intervening acts breaking the causal chain.

An intervening act of misconduct by the plaintiff can break the "causal link between the protected conduct and the adverse employment action."[100] And some courts have found that failing to meet an employer's performance standards can break

---

clarify the role of "but for" causation in a plaintiff's prima facie case). However, the Court finds that here it is irrelevant because, for the reasons stated in this Order, Plaintiff can make out "but for" causation, at the *prima facie* stage.

[98] *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (noting that "mere temporal proximity, without more, must be very close") (internal quotation marks omitted).

[99] *Redd v. United Parcel Serv., Inc.*, No. 14-14945, 2015 WL 3917361, at *8 (11th Cir. June 26, 2015) (citing *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding that a seven-week gap between a protected activity and an adverse employment action was sufficiently proximate to create a nexus for purposes of establishing a *prima facie* case of retaliation)); *see also Raspanti v. Four Amigos Travel, Inc.*, 266 Fed. Appx. 820, 823 (11th Cir. Jan. 29, 2008) (noting that a "close temporal proximity" between the time of a plaintiff's protected activity and an adverse employment action would be sufficient to satisfy the plaintiff's burden of proving but-for causation at summary judgment for an FLSA retaliation claim).

[100] *Henderson v. FedEx Express*, 442 Fed. App'x. 502, 506 (11th Cir. 2011) (citations omitted).

the causal chain.[101] The Court finds that although temporal proximity can be broken by a plaintiff's intervening acts, such as her performance, Plaintiff has raised a genuine issue of material fact from which a reasonable jury could find that her attitude was not an intervening act.

Defendant argues that after Plaintiff complained to Cawthon about her pay on Thursday, April 4, an investigation ensued to determine why Plaintiff had not received a merit increase in over 10 years. Cawthon emailed Hutchings and Lord; Hutchings replied that she was "not the best operator in the world" and that no one wanted to work with her. On Friday, April 5, 2013, Cawthon met with Hutchings and Plaintiff.

Cawthon testified that the meeting was designed to get her "on track" and "to be positive."[102] Although Plaintiff tells a different story, Defendant claims Plaintiff became agitated, argumentative, and disruptive, and was mocking and laughing at the two men, and because he could tell from the expression on her face that she had an "attitude", she was placed on suspension. Plaintiff denies being argumentative, and remained silent because she was trying to make sure she heard what he was saying, she meant no disrespect, and she was nervous.

---

[101] *Hankins v. AirTran Airways, Inc.*, 237 Fed App'x 513, 521 (11th Cir. 2007) (finding that failure to meet the performance standards set by the employer broke the causal connection, despite a close proximity in time between the complaint and adverse action); *see also Whatley v. Metro. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1329 (5th Cir. 1980) (finding plaintiff's termination to be "a culmination of problems growing out of [plaintiff's] manner of handling his job, his lack of cooperation within his office, his mismanagement of his staff, his refusal to comply with the terms of his job description, and his refusal to follow instructions from his supervisor).
[102] Cawthon Dep., Doc. 26-4 at 59-60.

Defendant relies on Plaintiff's "attitude" for its legitimate reason for suspending her and that her "attitude" was sufficient to break the causal chain.  However, given the record presented to the Court, "attitude" is simply too subjective of an adjectival label and would require the Court to make credibility determinations, which it simply cannot do.[103]  A reasonable jury could find Plaintiff had an "attitude" or was just responding in a reasonable way to an arguably threatening situation, especially in light of the fact that the meeting was precipitated by her complaint of unequal pay and followed by a suspension, all within a twenty-four hour period. Therefore, the Court finds Plaintiff's disputed attitude in the meeting insufficient to break the causal chain established by such close temporal proximity.

Defendant also argues that Plaintiff's failure to respond to Cawthon's request for the letter in a satisfactory way was an intervening act, breaking the causal chain established by the close temporal proximity of one week. In the letter written on April 5, Cawthon instructed Plaintiff that she would remain suspended until she provided Defendant with a "written commitment assuring us that your performance and attitude will meet our expectations moving forward." Plaintiff received Cawthon's letter on Monday and sent a response on Tuesday.

---

[103] *See Yazdian v. ConMed Endoscopic Technologies, Inc.*, No. 14-3745, 2015 WL 4231698, at *13 (6th Cir. 2015) (finding that an "allegedly insubordinate act may be a response to a sort of unspoken, subliminal discrimination in the workplace" and should be weighed by a jury by examining the actions in context and by looking at the demeanor of the speakers).

Plaintiff mailed her letter on Tuesday. That same day, Cawthon mailed a second letter to Plaintiff. Plaintiff received Cawthon's first letter on Wednesday. In the second letter, Defendant asked Plaintiff to address how she would improve her attitude and performance by Friday or she would be terminated. Plaintiff did not respond to Cawthon's second letter because it was so close in time to her response that Cawthon could not have received her letter and sent out the second letter in response to it.[104] Indeed, Cawthon did not receive Plaintiff's letter till Wednesday, the day after he sent his second letter. Although Cawthon said he found her response unacceptable, the Court finds that given the facts surrounding Plaintiff's suspension, along with the extremely close temporal proximity between Plaintiff's compliant and her termination, that Plaintiff's failure to respond to Defendant's second letter is simply not an intervening act so as to break the causal chain.

Defendant's reasons for its suspension and termination of Plaintiff—her attitude in the April 5 meeting and her failure to provide a written commitment that her performance and attitude would improve—are legitimate non-discriminatory reasons. Thus, the burden shifts back to Plaintiff to demonstrate pretext.

In order to establish pretext, Plaintiff must demonstrate that Defendant's proffered reasons were not the real reasons for the employment decision.[105] In other words, Plaintiff must "cast sufficient doubt on the defendant's proffered

---

[104] Pl. Dep., Doc 26-1 at  77.
[105] *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."[106] Plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[107] In the latter approach, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."[108]

Plaintiff contends that "but for" her complaint of unequal pay, she never would have been suspended or terminated. Indeed, Plaintiff's immediate suspension only one day after her complaint of unequal pay and ultimate termination one week later would typically be more than sufficient to meet the "but for" standard required in establishing pretext in retaliation cases.[109] However, as noted above, there is a question of fact as to Defendant's claim that Plaintiff's intervening acts (i.e., her attitude and unsatisfactory letter) broke the causal chain. Moreover, there is, as also noted in the Court's EPA analysis, a question of fact as to whether Plaintiff even had longstanding performance and attitude problems during her employment with Defendant that needed to be

---

[106] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted).
[107] *Id.*
[108] *Jackson*, 405 F.3d at 1289; *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001).
[109] *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

addressed, which were Cawthon's and Hutchings's stated reasons for calling the meeting in the first place. Therefore, because a reasonable jury could find Defendant's reasons for Plaintiff's suspension and termination, coupled with the close sequence of events, suspect and unworthy of credence, there is a question of fact precluding summary judgment as a matter of law.

Therefore, for the aforementioned reasons, the Court **DENIES** both Parties Motions for Summary Judgment as to Plaintiff's retaliation claims.

### C. Willfulness and Liquidated Damages

Finally, Defendant asks that if the Court denies Defendant summary judgment on Plaintiff's wage discrimination and retaliation claims, that it grant partial summary judgment on the issue of whether Plaintiff is entitled to liquidated damages for any alleged violation of the EPA. Under the EPA, which incorporates the damages provisions of the FLSA, liquidated damages may be awarded in an amount equal to the amount of unpaid wages.[110] However, courts need not award liquidated damages for violations of the EPA if:

> [t]he employer shows to the satisfaction of the Court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation . . . the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act.

---

[110] 29 U.S.C. § 216(b).

To prove willfulness, Defendant must have acted with knowledge or reckless disregard of its violation of the Act.[111]  Moreover, where Defendant has acted in bad faith, the statute of limitations is extended from two to three years.[112] However, an employer does not act willfully if he "acts unreasonably, but not recklessly, in determining his legal obligation" under the Act.[113]

Defendant argues that the record is insufficient to show that Defendant knowingly or recklessly violated the EPA.[114] Defendant claims that it acted in good faith because Cawthon investigated Plaintiff's complaint regarding her unequal wages.[115] Plaintiff, on the other hand, disputes the "thoroughness" of Cawthon's investigation, and instead calls it an attempt to "dig up dirt" on Plaintiff.[116] Plaintiff further avers that despite having EEO policies, Defendant never conducted an audit of its employees. The Court finds that at this time that there are too many issues of material fact surrounding Plaintiff's claims to rule as a matter of law on this issue.

---

[111] *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1012 (11th Cir. 1989) (employer may avoid liquidated damages if the "employer shows its actions were in good faith and shows it had reasonable grounds for believing that those actions did not violate the Equal Pay Act") (citations omitted).

[112] 29 U.S.C. § 255(a).

[113] *Alvarez Perez v. Sanford-Orlando Kennel Club. Inc.*, 515 F.3d 1150, 1162-63 (11th Cir. 2008).

[114] Def. MSJ, Doc. 22 at 19.

[115]  *See Reeves v. International Telephone and Telegraph Corp.*, 616 F.2d 1342, 1353 (5th Cir.1980) ("Good faith requires some duty to investigate potential liability...."), cert. denied, 449 U.S. 1077 (1981).

[116] Additionally, Defendant points to the fact that Lord recognized Plaintiff's pay disparity in 2012 and decided with Hutchings that because of her performance she did not deserve a merit increase. However, Plaintiff asserts that Plaintiff told Ronnie Adams several months pervious to her complaint with Cawthon that she had not received a raise in 10 years.

For the reasons stated above, the Court **DENIES** Defendant's Motion for Summary Judgment [Doc. 22] and **DENIES** Plaintiff's Motion for Summary Judgment [Doc. 24].

**SO ORDERED,** this 30th day of September, 2015.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE